UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT D. SANGO,

                       Plaintiff,                   Case No. 1:14-cv-2

v.                                      Honorable Robert J. Jonker

ERICA HUSS et al.,

                       Defendants.

_____/

## OPINION

         This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff will pay the initial partial filing fee when funds become available.  Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, Plaintiff's action will be dismissed.  Plaintiff's federal claims will be dismissed for failure to state a claim.  The Court declines to exercise jurisdiction over Plaintiff's state-law claims, which will be dismissed without prejudice.

## Factual Allegations

Plaintiff Robert D. Sango is incarcerated by the Michigan Department of Corrections (MDOC) at Ionia Correctional Facility (ICF).  In his amended complaint, he sues the following MDOC employees located at ICF: "Deputy of Housing / Programs" Erica Huss, Deputy Warden Nannett Norwood, Resident Unit Supervisor (RUS) Harold L. Gilkey, Assistant Resident Unit Supervisor (ARUS) R. Ault, and Corrections Officer (unknown) Lamphere.  (Am. Compl., docket #21, Page ID#53.)

According to the amended complaint, Plaintiff was convicted of a misconduct for assaulting a prison officer at St. Louis Correctional Facility.  As a result, he was placed in segregation and his security classification was changed to administrative segregation.[1]  On December 3, 2013, the Security Classification Committee (SCC) held its first hearing to review Plaintiff's classification.[2]  Deputy Huss was present at the meeting as a member of the SCC, along with Resident Unit Manager (RUM) Ball.  Though Ball signs all SCC decisions, Plaintiff asserts that Huss is the only one who speaks at the hearings and is the one who actually makes the classification decision on behalf of the SCC.  Huss reviewed Plaintiff's file and noted that Plaintiff's "institutional

---

[1]According to MDOC policy, prisoners may be placed in one of several security levels, including: "Levels I, II, IV, V, and administrative segregation. . . . [A]dministrative segregation is the most secure."  MDOC Policy Directive 05.01.130 (Nov. 1, 2010).  Prisoners may be classified to administrative segregation if they pose a threat to security or safety.  *See* MDOC Policy Directive 04.05.120 ¶ L (Sept. 27, 2010).  Confinement in segregation due to a security classification (administrative segregation) is distinct from confinement in segregation for punitive or disciplinary reasons ("punitive segregation").  *See id.* ¶ U.  Punitive segregation ends on the date specified in a sanction order, *id.* ¶ U, whereas "[a] prisoner classified to administrative segregation remains in that classification regardless of his/her housing placement or any imposed disciplinary sanctions (e.g., detention) until s/he is reclassified," *id.* ¶ G.

[2]The SCC reviews the "behavioral adjustment" of a prisoner classified to administrative segregation at least once a week "during the first two months in segregation and at least every 30 calendar days thereafter until the prisoner is reclassified to general population status."  MDOC Policy Directive 04.05.120 ¶ BBB.

history did not warrant Regional Prison Administrator (RPA) approval." (*Id.* at Page ID#54.) According to Plaintiff, he must "wait every 12 months to see the RPA." (*Id.*)

Defendant Ault subsequently prepared a "Segregation Behavior Review" with "heightened language," claiming that Plaintiff had been convicted of a misconduct for hitting an officer on the "forehead," and that the assaulted officer had to attend "occupational health for his injury." (*Id.*) According to the misconduct report, however, Plaintiff hit the officer on the "forearm," and the officer went to "occupational health for injuries incurred from the incident," which included injuries from being sprayed with pepper spray by another officer. (*Id.*) Plaintiff told Ault that his statements were incorrect, but Ault said that he did not care, and told Plaintiff to "deal with it." (*Id.*)

At Plaintiff's "4th week" SCC hearing, allegedly one month before he would have been released from segregation, Huss initially stated that it "looked like" Plaintiff would be returning to Level IV. (*Id.*) Then she read Ault's report and stated, "forehead! Why didn't we RPA him?" (*Id.*) Plaintiff attempted to explain that Ault had used "heightened language" in his report, but she would not listen. (*Id.*) Plaintiff wrote a grievance about the issue, and the next time that Huss saw Plaintiff, she told him that "since [he] wanted to put her name in [his] paperwork," she would "RPA [him], that [he] would remain in segregation until the next summer." (*Id.*)

Plaintiff contends that Defendant Lamphere read Ault's report and then "began treating [Plaintiff] inhumane[ly]." (*Id.* at Page ID#55.) He did not feed Plaintiff for "several days" at lunch and breakfast, when he worked on Plaintiff's floor. (*Id.*) Also, he took documents from Plaintiff's cell, including documents "related to" Plaintiff's amended complaint. (*Id.*)

Plaintiff also alleges that Defendant Gilkey is an "Old Family Friend" who knows Plaintiff's mother and her husband.  (*Id.*)  In 2011, Gilkey allegedly made certain promises to Plaintiff's mother and her husband, but when Gilkey could not keep those promises, he started "harassing" Plaintiff.  (*Id.*)  In particular, he refused to pay Plaintiff "standard hazard pay for cleaning up behind an inmate who was being given a live stream of T-B to eat his cancer,"[3] and he did not give Plaintiff "proper" cleaning supplies (*i.e.* "bleach instead of citrus").  (*Id.*)  When Plaintiff requested a transfer to another facility, Gilkey granted his request.  (*Id.*)  Plaintiff then requested a "SPON" against Gilkey because of Plaintiff's "family ties" to him.[4]  Plaintiff asserts that the Internal Affairs Division initiated an investigation into the matter, but Plaintiff did not cooperate with the investigation, so he was sent back to ICF in May 2012.  Gilkey then "had staff harass [Plaintiff] for 10 days, then sent [Plaintiff] away" to another facility when Plaintiff threatened to sue him.  (*Id.* at Page ID#56.)  Defendant Warden Norwood eventually approved a SPON on May 8, 2012.

After Plaintiff returned to ICF in 2013, Gilkey allegedly came to Plaintiff's cell and called Plaintiff a "traitor," called Plaintiff's mother a "broke bitch," and referred to her husband as a "bumb nigga."  (*Id.*)  Plaintiff complained to Deputy Norwood about the actions of Ault, Gilkey, Huss, and Lamphere, but she has not taken any corrective action.

---

[3]MDOC Policy Directive 05.02.110 ¶ K (Feb. 25, 2008) provides as follows:

A prisoner shall be paid one and one half times his/her normal rate of pay for those days s/he is required to work under conditions which are considered unusually difficult (e.g., bloodborne pathogen clean up, working with high voltage). The Warden or designee shall determine what conditions shall warrant such pay.

[4]SPON is an abbreviation for "Special Problem Offender Notice."  MDOC Policy Directive 03.03.110 (May 20, 2002).  It is used for documenting "[s]pecific information about dangerous or potentially dangerous offenders, and known or potential conflict situations between offenders[.]" *Id.*  Prisoners are not to be housed in the same facility as the other individual identified in the SPON.  *See id.* ¶¶ I, J.

In an affidavit filed subsequent to the amended complaint (docket #23), Plaintiff contends that on February 24, 2014, he participated in a teleconference hearing with a magistrate judge in connection with a case that Plaintiff filed in the Eastern District of Michigan, *Sango v. Johnson et al.*, No. 2:13-cv-12808 (E.D. Mich.). Defendant Ault was also present for the hearing. After the hearing, the magistrate judge issued a report and recommendation (R&R) to enter an injunction against Ault. Among other things, the proposed injunction ordered Ault not to retaliate against Plaintiff. The R&R was adopted by the court on March 6, 2014. Since the date of the teleconference hearing, Defendant Ault has allegedly engaged in a "campaign of retaliation" against Plaintiff. (*Id.* at Page ID#69.) When Plaintiff showed the R&R to Defendant Ault, Ault stated, "I've been doing this 25 years, I'm not worried about the court." (*Id.*)

On March 14, 2014, Defendant Huss held another SCC hearing, at which she stated, "[S]o what is this about you lying on my officers?" (*Id.*) She ended the hearing by telling Plaintiff, "you better learn to do your own time." (*Id.*)

On March 17, 2014, Plaintiff allegedly filed a "notice of violation" of the injunction order, because Ault called Plaintiff a "piece of shit" and said that he would see Plaintiff in court. (*Id.*)

Based on the foregoing, Plaintiff asserts that Defendants are liable under 42 U.S.C. § 1983. In addition, in an affidavit that the Court construes to be a supplement to the amended complaint, Plaintiff asserts that Defendants Ault and Huss are liable for negligence under state law, because they did not comply with MDOC policies regarding segregation review. (*See* Pl.'s Declaration of Facts, docket #28.) Plaintiff asserts that Ault "never speaks up" at the SCC hearings as he should, and that Huss did not comply with her "duty" to "submit[] Plaintiff for approval to be

released from segregation by the warden/RPA[.]" (*See id.* at Page ID##76-77 (citing MDOC Policy Directive 04.05.120 ¶¶ HHH, III).)

## Discussion

### I.   Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Thus, to the extent that Plaintiff alleges merely a violation of state law or prison policies, he does not state a § 1983 claim.

## A.  Deputy Warden Norwood

Plaintiff's only allegations regarding Defendant Norwood are that she approved a SPON for Plaintiff and she failed to correct the actions of her subordinates. Approving a SPON (that Plaintiff himself had requested) did not violate his constitutional rights. Moreover, Norwood cannot be held liable under § 1983 for failing to take other action in response to Plaintiff's complaints about other prison officials. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may

not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in such a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has not alleged that Defendant Norwood engaged in any active unconstitutional behavior. Thus, he fails to state a claim against her.

### B.  RUS Gilkey

Plaintiff asserts that Defendant Gilkey (1) refused to pay Plaintiff hazard pay, (2) did not give Plaintiff proper cleaning supplies, (3) had staff "harass" Plaintiff for 10 days, (4) called Plaintiff and his family derogatory names, and (5) transferred Plaintiff to another facility after Plaintiff threatened to sue him.

#### 1.  Hazard pay

With respect to Defendant Gilkey's refusal to give Plaintiff hazard pay for his work, Plaintiff does not have a constitutional right to receive wages for work performed in a prison work assignment, let alone a specific amount of wages for such work. The Sixth Circuit has consistently found that prisoners have no constitutionally protected liberty interest in prison employment under the Fourteenth Amendment. *See, e.g.*, *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (district court properly dismissed as frivolous the plaintiff's claim that he was fired from his prison job); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Carter v. Tucker*, No. 03-5021, 2003 WL 21518730, at *2 (6th Cir. July 1, 2003) (same). Morever, "as the Constitution and federal law do not create a

property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 2003 WL 21518730 at *2 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989)).

Even if Plaintiff has a property right to his wages under *state* law, he does not state a due process claim because he does not allege that available post-deprivation remedies were inadequate to remedy his loss. Under *Parratt v. Taylor*, 451 U.S. 527 (1981), a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Id.* at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Plaintiff does not allege that post-deprivation remedies are inadequate. Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of the due-process claim. *See Brooks v. Dutton*, 751 F.2d 197, 199 (6th Cir. 1985).

### 2. Harassment

Plaintiff's assertion that Gilkey encouraged other officials to "harass" Plaintiff is vague and unsupported by any allegations of fact. Moreover, harassment can take many forms, some of which may be unconstitutional and some of which clearly are not. *See Ivey*, 832 F.2d at 954-55 ("verbal abuse" and "harassment" do not violate the constitution).

- 9 -

Plaintiff implies that Gilkey's actions were motivated by the fact that Plaintiff requested a SPON against him. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* A specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights. *See, e.g., id.* at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. App'x at 542. Plaintiff alleges no details regarding the harassment he received; thus, his allegations do not state a plausible claim because they permit only an inference of a "mere possibility" of misconduct. *See Iqbal*, 556 U.S. at 679.

### 3.  Verbal abuse

Gilkey's name-calling and verbal abuse is a type of "harassment" that does not give rise to a constitutional claim. The use of harassing or degrading language by a prison official, although unprofessional and deplorable, generally does not rise to constitutional dimensions. *See Ivey*, 832 F.2d at 954-55; *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth

Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment and idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment.").

### 4. Cleaning supplies

Plaintiff's assertion that Gilkey gave him citrus cleaning agents instead of bleach to clean up after an inmate also does not state a claim. Inmates have a constitutionally protected right to health and safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834 (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

Plaintiff does not allege that he was exposed to an objectively serious risk of harm due to the fact that he was required to perform some cleaning work with the use of a citrus-based cleaner rather than bleach, let alone that Gilkey was aware of the risk and was deliberately indifferent to it.

### 5.  Transfer

Gilkey allegedly transferred Plaintiff from ICF to another facility when Plaintiff threatened to sue him.  Assuming that a prisoner's threat to sue a prison official is protected conduct, Plaintiff cannot satisfy the adverse-action requirement of a retaliation claim.  "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct."  *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005); *see also Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("[T]ransfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights[.]") (internal quotation marks omitted).  If, however, the transfer results in a foreseeable negative consequence, such as a significant inhibition of the prisoner's ability to access the courts, then such a transfer could be considered an "adverse action." *See Siggers-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney).  Plaintiff alleges no foreseeable adverse consequences as a result of his transfer by Gilkey.  Thus, the transfer does not give rise to a § 1983 claim.  In short, Plaintiff does not state a claim against Defendant Gilkey.

### C.  ARUS Ault

Defendant Ault allegedly made false or misleading statements about Plaintiff in a segregation behavior review report, which was considered by Defendant Huss in connection with a review of Plaintiff's ongoing confinement in segregation.  Ault also made disparaging remarks about Plaintiff and commented on Plaintiff's lawsuit.

### 1.  Segregation review

Plaintiff apparently contends that Ault's statements in the segregation behavior review made it more likely for Plaintiff to remain in segregation.  The Court notes that Plaintiff does not have a constitutional right to avoid segregation.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("[S]egregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.").  What he has, at most, is a *procedural* right to meaningful review of the necessity for such confinement, *if* that confinement imposes an "an atypical and significant hardship" on him "in relation to the ordinary incidents of prison life."  *See Sandin v. Conner,* 515 U.S. 472, 486-87 (1995).  Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden–Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008).

In *Sandin*, the Supreme Court concluded that disciplinary segregation for 30 days did not impose an atypical and significant hardship.  *Sandin,* 515 U.S. at 484.  Similarly, the Sixth Circuit has held that mere placement in segregation, or confinement in segregation for a relatively short period of time, does not require the protections of due process.  *See Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir. 1995) (placement in administrative segregation is not an atypical and significant hardship); *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010) (61 days in

segregation is not atypical and significant).  Even confinement in segregation for a relatively long period of time might not implicate a liberty interest, depending on the circumstances.  *See, e.g.*, *Jones v. Baker,* 155 F.3d 810, 812-23 (6th Cir. 1998) (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke,* 111 F.3d 460 (6th Cir.1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding); *see also Joseph,* 410 F. App'x at 868 (noting that confinement in segregation triggers a right to due process only in "extreme circumstances").

Plaintiff has not alleged facts regarding the nature and duration of his segregation that would indicate it imposed an atypical and significant hardship.  Plaintiff does not expressly indicate when his segregation started, but it appears that when Huss reviewed Ault's allegedly misleading report, he had been confined in segregation for only four weeks, which is shorter than the period of time at issue in *Sandin* and *Joseph*.  Moreover, Plaintiff acknowledges that his segregation followed a misconduct conviction for an assault on a prison officer.  In *Mackey*, the Sixth Circuit concluded that one year of segregation following a conviction for assault on another prisoner was not atypical and significant.  Thus, to the extent that Plaintiff asserts a due process claim, he has not alleged facts indicating that a liberty interest was at stake.  "Without a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007).

Even if Ault's actions implicated Plaintiff's liberty interests, it appears that Plaintiff received all of the process to which he was entitled.  Where a liberty interest is shown, the due process claim "is not complete unless and until the State fails to provide due process."  *Zinermon*

- 14 -

*v. Burch,* 494 U.S. 113, 126 (1990). Due process with regard to confinement in segregation requires "some sort of periodic review," but does "not necessarily require that prison officials permit the submission of any additional evidence or statements." *Hewitt,* 459 U.S. at 477 n.9. The decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 454 (1985). Thus, where an inmate's confinement in segregation implicates a liberty interest, he is entitled to a "periodic review of his confinement, supported by some evidence or indicia of reliability." *Harris v. Caruso,* 465 F. App'x 481, 485 (6th Cir. 2012).

Plaintiff acknowledges that he received a hearing before Defendant Huss regarding his confinement in segregation, at which he was able to present his concerns regarding Ault's statements. Thus, it appears that Plaintiff received all the process to which he was entitled. In sum, therefore, Ault's allegedly misleading statements did not deprive Plaintiff of his right to due process, or any other constitutional right.

## 2. Disparaging remarks

Several months after the SCC hearing, Defendant Ault allegedly called Plaintiff derogatory names and commented on Plaintiff's lawsuit, but those actions do not give rise to a retaliation claim because they do not satisfy the adverse-action requirement. Harmless comments like the ones made by Defendant Ault are not sufficiently adverse to deter a person of ordinary firmness from engaging in protected conduct. *See Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) ("harmless name-calling" does not satisfy the adverse-action requirement). Thus, Plaintiff does not state a plausible retaliation claim, or any other constitutional claim, against Defendant Ault.

### D.  Officer Lamphere

Plaintiff asserts that Defendant Lamphere deprived him of meals and stole certain documents from his cell.

#### 1.  Deprivation of meals

Plaintiff contends that Defendant Lamphere did not feed Plaintiff "for several days for lunch and breakfast, when he worked [Plaintiff's] floor."  (Am. Compl., docket #21, Page ID#55.)  "[T]he Eighth Amendment imposes a duty on officials to provide 'humane conditions of confinement,' including insuring, among other things, that prisoners receive adequate . . . food." *Young ex rel. Estate of Young v. Martin*, 51 F. App'x 509, 513 (6th Cir. 2002) (quoting *Farmer*, 511 U.S. at 832).  The Constitution "does not mandate comfortable prisons," however.  *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey v. Wilson*, 832 F.2d 960, 954 (6th Cir. 1987).  Thus, the deprivation of a few meals for a limited time generally does not rise to the level of an Eighth Amendment violation.  *See Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (per curiam) (providing a prisoner only one meal per day for fifteen days did not violate the Eighth Amendment, because the meals provided contained sufficient nutrition to sustain normal health); *Davis v. Miron*, 502 F. App'x 569, 570 (6th Cir. 2012) (denial of seven meals over six days is not an Eighth Amendment violation); *Richmond v. Settles*, 450 F. App'x 448, 456 (6th Cir. 2011) (same); *see also Berry v. Brady*, 192 F.3d 504, 507-08 (5th Cir. 1999) (denial of a few meals over several months does not state a claim); *Staten v. Terhune*, No. 01-17355, 2003 WL 21436162, at *1 (9th Cir. June 16, 2003) (deprivation of two meals is not sufficiently serious to form the basis of an Eighth Amendment claim); *Cagle v. Perry*,

No. 9:04–CV–1151, 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe" to give rise to an Eighth Amendment claim).

In *Richmond*, the Sixth Circuit determined that a prisoner who was deprived of five meals over three consecutive days, and a total of seven meals over six consecutive days, did not state a viable Eighth Amendment claim, because he "does not allege that his health suffered as a result of not receiving the meals." *Richmond*, 450 F. App'x at 456. In *Cunningham*, the Sixth Circuit determined that providing a prisoner only one meal a day for over two weeks was not an Eighth Amendment violation, because the meals provided were adequate to sustain normal health. *Cunningham*, 667 F.2d at 566. Plaintiff does not allege that his health suffered as a result of the deprivation, or that the meals he did receive were inadequate to sustain his health. Consequently, Plaintiff does not state a plausible claim against Lamphere. *See Iqbal*, 556 U.S. at 679 (noting that the allegations must permit an inference of more than a "mere possibility" of misconduct).

### 2. Stolen documents

Defendant Lamphere allegedly stole unidentified documents from Plaintiff's cell. To the extent Plaintiff contends that his property was taken without due process, he has not alleged that state remedies are inadequate to remedy his loss. *Parratt*, 451 U.S. at 537; *Hudson*, 468 U.S. at 530-36. Thus, he does not state a due process claim.

### 3. Retaliation

Plaintiff implies that Lamphere's conduct was retaliatory. To the extent that Plaintiff intends to assert a First Amendment retaliation claim, however, he does not allege facts to support a reasonable inference that Lamphere's actions were motivated by any protected conduct. Indeed, in the complaint, Plaintiff contends that Lamphere harassed Plaintiff because of Plaintiff's assault

on another prison officer. (*See* Am. Compl., docket #21, Page ID#55 ("Correctional Officer Lamphere read the improper language on my 'Segregation Behavior Review' and began treating me inhumane[, which was] Ault's intention that is, to cause officers to physically harm me because they would believe I hit a fellow officer in 'the forehead' . . . .").) As indicated, however, an assault on another prison officer is not protected conduct. Thus, Plaintiff does not state a claim against Defendant Lamphere.

### E. Deputy Huss

Plaintiff claims that Defendant Huss decided to "RPA" him after he filed a grievance against her, which was an act of retaliation as well as a violation of her duty under MDOC Policy Directive 04.05.120, paragraphs HHH and III, which state, in relevant part:

> HHH.   A prisoner may be reclassified from administrative segregation only with the approval of SCC and the concurrence of the Warden or designee; however, a prisoner confined to administrative segregation as a result of an assault on staff resulting in serious physical injury to staff . . . may be reclassified only with written approval of the Warden and the appropriate RPA. If the Warden supports reclassification, s/he shall submit a Request for Approval to Reclassify from Administrative Segregation (CSJ-283b) to the RPA to obtain approval.

> III.   A decision to reclassify and release a prisoner from administrative segregation shall be based upon the following factors:

> 1.   Review of the circumstances which necessitated segregation as well as any history of prior behavior which also required segregation;

> 2.   Assessment of the prisoner's behavior and attitude while in segregation to determine if it is consistent with the behavior and attitude of prisoners in the general population;

> 3.   Evaluation of the prisoner's potential to honor the trust implicit in less restrictive confinement;

> 4.   Assessment of the prisoner's need for correctional mental health services, including additional treatment and medication and any need for

placement in an in-patient psychiatric unit or any residential treatment program.

*Id.*

Plaintiff alleges that when Defendant Huss initially reviewed Plaintiff's file at his SCC hearing, she seemed to think that he would be reclassified to Level IV in one month's time, and she determined that reclassification would not require approval from the RPA. After she read Defendant Ault's report, however, she thought otherwise. Apparently, Ault's description of Plaintiff's misconduct suggested that his confinement was "a result of an assault on staff resulting in serious physical injury to staff[.]" *See id.* ¶ HHH. In that case, reclassification would require written approval from the RPA as well as the warden. *Id.* Plaintiff allegedly complained to Huss that Ault's report was inaccurate, but Plaintiff contends that she would not listen. Later, after Plaintiff filed a grievance about the issue, she told him that she was going to "RPA" him, which presumably means that she would let the RPA decide his classification. According to Plaintiff, Huss's decision meant that he would have to remain in segregation for up to a year, because he sees the RPA only after he has been in segregation for 12 months.

Plaintiff's retaliation claim against Defendant Huss is not plausible for several reasons. First, there is the issue of causation. Plaintiff apparently claims that Huss did not decide to "RPA" him until after he filed his grievance against her, and then did so because of the grievance. Even before he filed his grievance, however, she had already noted that RPA approval was necessary, and he contends that she would not listen to his arguments to the contrary. Indeed, he ostensibly filed his grievance against her for this very reason. Thus, his theory of causation relies on the circular premise that she retaliated against him by requiring approval from the RPA because he filed a grievance complaining that she was going to require approval from the RPA. If she had

already determined that RPA approval was necessary *before* he filed the grievance, then Plaintiff cannot possibly show that her actions were motivated by his grievance.

Second, assuming that Plaintiff can demonstrate causation, there remains the question of whether her conduct is sufficiently adverse to state a claim. *See Thaddeus-X*, 175 F.3d at 394. Defendant Huss's allegedly adverse action in this case was to determine that another prison official, the RPA, should approve his security classification. There is nothing inherently adverse about that determination; it merely means that an another official would have to make a decision regarding Plaintiff's classification.

Plaintiff apparently contends that Huss's decision effectively extended the term of his segregation because he must wait twelve months to see the RPA. In support of this contention, Plaintiff cites MDOC Policy Directive 04.05.120 ¶ GGG, which states that "RPAs shall personally interview each prisoner in their respective regions who has been confined in administrative segregation for twelve continuous months." *Id.* If the segregation continues beyond that time, "the RPA shall interview the prisoner every twelve months thereafter until the prisoner is released from administrative segregation." *Id.* Plaintiff apparently assumes that the RPA will review a prisoner's classification only in connection with its yearly interview, but that cannot be the case. The warden also conducts periodic interviews of prisoners in administrative segregation, with the first interview occurring after six continuous months of segregation, and then every six months thereafter. *See id.* ¶ EEE. Despite the six-month delay between interviews, the warden must personally approve in writing any confinement in segregation that lasts longer than 30 days. *Id.* Also, she must approve *every* reclassification from administrative segregation to a lower security level. *Id.* ¶ HHH. If Plaintiff's interpretation of the policy is correct as to the RPA, then presumably the same

interpretation would apply to the warden.  In other words, all prisoners classified to administrative segregation would have to wait at least six months for their personal interview with the warden before they could be reclassified.  Such an inflexible treatment of prisoners in segregation runs counter to common sense and to Plaintiff's own contention that he would have been reclassified after only two months.

Also, Plaintiff's interpretation would render the personal interviews conducted by the SCC, which occur every week for the first four weeks of segregation and every 30 days thereafter, somewhat redundant.  *Id.* ¶ BBB.  In addition, if the RPA reviews classification requests only in connection with its yearly interview, then presumably it would not be necessary for the policy to require that the warden forward the SCC's completed Segregation Behavior Review forms to the RPA "*for review . . . each month* until the prisoner is reclassified . . . ."  *See id.* ¶ EEE (emphasis added).  A more plausible interpretation of the policy is that the SCC is responsible for conducting a security classification review at least once a month in connection with a personal interview, the results of which are sent to the warden and the RPA for review.  *See id.*  The warden and the RPA conduct personal interviews on a less frequent basis to provide additional oversight for an extended period of confinement in administrative segregation, but approval of reclassification is not dependent upon the timing of those interviews, which merely supplement the reviews conducted by the SCC.  In short, Plaintiff's assumption that RPA approval necessarily requires a one-year waiting period does not make sense in light of the structure and content of the MDOC's policies regarding segregation review.

Plaintiff also claims that Defendant Huss had a duty to request reclassification from the warden and/or RPA, and his retaliation claim is premised on the additional assumption that she

- 21 -

could delay his reclassification for up to a year merely by determining that it needed RPA approval. As indicated *supra*, the warden must approve any confinement in segregation that exceeds 30 days, must approve reclassification, and must personally interview prisoners in segregation at least once every six months.  Also, according to paragraph HHH, it is up to the warden (not the SCC, not Deputy Huss) to make a reclassification request to the RPA.  *See id.* ¶ HHH ("If the Warden supports reclassification, s/he shall submit a Request for Approval to Reclassify from Administrative Segregation (CSJ-283b) to the RPA to obtain approval.").  Consequently, long before Plaintiff meets with the RPA, his segregation will be reviewed by the person responsible both for approving his ongoing classification and for requesting RPA approval of a new one.  Thus, Plaintiff's assumption that Huss could delay his reclassification for a year is at odds not only with the overarching policy regarding segregation review, but also with the specific provision on which Plaintiff relies to assert his claims.  For all of the foregoing reasons, Plaintiff does not state a plausible retaliation claim against Defendant Huss.

## II.   Supplemental Jurisdiction

Plaintiff has filed a motion (docket #27) requesting that the Court exercise supplemental jurisdiction over certain state-law claims against Defendants Ault and Huss.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id*.  Dismissal, however, remains

- 22 -

"purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. All of Plaintiff's federal claims are subject to dismissal. Thus, the Court declines to exercise supplemental jurisdiction.

In his motion and declaration of facts in support thereof, Plaintiff asserts that Gary Ball, one of the members of the SCC, is also liable for negligence because he does not correct Defendant Huss or order her to follow policy at the SCC hearings. Plaintiff does not name Ball as a Defendant in the amended complaint, and to the extent he intends to add Ball to the action, the Court declines to do so for the same reasons that it declines to exercise supplemental jurisdiction. Plaintiff's claim against Ball arises solely under state law. The Court declines to exercise jurisdiction over that claim. Thus, Plaintiff's motion for exercise of supplemental jurisdiction will be denied and the state-law claims in the complaint will be dismissed without prejudice.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's claims under 42 U.S.C. § 1983 will be dismissed for failure to state a claim, pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's state-law claims will be dismissed without prejudice, because the Court declines to exercise supplemental jurisdiction over them.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no

good-faith basis for an appeal.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An Order and Judgment consistent with this Opinion will be entered.


Dated:      June 12, 2014              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       UNITED STATES DISTRICT JUDGE